IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN B. RAO, JR. | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| TEXAS PARKS AND WILDLIFE | § | |
| DEPARTMENT | § | |
| Defendant | § | JURY DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

John B. Rao, Jr., Plaintiff, files this Original Complaint, complaining of the Texas Parks and Wildlife Department, and for his cause of action, respectfully shows the following:

## I.
## INTRODUCTION

1.  This action seeks equitable relief, actual damages, compensatory damages, attorney's fees, expert witness fees, taxable costs of court, pre-judgment and post-judgment interest for the unlawful retaliation suffered by Plaintiff in the course of his employment with the Defendant.

2.  Plaintiff's cause of action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.

3.  Plaintiff demands a jury on all issues triable to a jury.

## II.
## PARTIES

4.  Plaintiff, John B. Rao, Jr., is a resident of Houston, Texas.

5. Defendant Texas Parks and Wildlife Department may be served with process through its Executive Director, Carter Smith, at 4200 Smith School Road, Austin, Texas 78744.

6. Whenever in this Complaint it is alleged that Defendant committed any act or omission, it is meant that the Defendant's officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, vice-principals, agents, servants, or employees.

### III.
### JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 since Plaintiff is bringing this claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* The Court has personal jurisdiction over Defendant since it maintains sufficient minimum contacts with the State of Texas.

8. Venue is proper in the Southern District of Texas, under 28 U.S.C. § 1391(b) since the events or omissions giving rise to this cause of action occurred in the Southern District of Texas.

9. This Court has jurisdiction over all claims in this action.

## IV.
## PROCEDURAL REQUISITES

10.    On September 16, 2010, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission, Civil Rights Division under Charge Number 460-2012-04155 asserting retaliation pursuant to Title VII.

11.    On December 14, 2012, the EEOC issued Plaintiff his Right to Sue.

12.    This lawsuit has been filed within (90) days of Plaintiff's receipt of the Notice of Right to Sue letter.

13.    All conditions precedent to filing this cause of action have been met.

## V.
## FACTS

14.    John Rao is a game warden for The Texas Parks and Wildlife Department ("TPWD").

15.    In his position as a game warden, Rao is a commissioned peace officer for the State of Texas.

16.    Historically, the TPWD has demonstrated a pattern of discriminating against African-Americans in its employment practices.

17.    For example, while TPWD has been a state agency for 49 years, during that time, only 1% of the Game Wardens hired have been African-American.

18.    Currently, the TPWD employs approximately 530 game wardens.

19.    Only 14 of those game wardens are African-American.

20.    In fact, since 2005, there have only been two African-American game wardens hired by TPWD.

21.    In addition, the African-Americans hired by TPWD experience extreme difficulty getting promoted in the Department.

22.    Only three African-Americans have ever achieved the rank of Captain during the entire existence of the TPWD.

23.    No African-American has ever achieved a rank higher than Captain.

24.    Upon his hiring at the TPWD, John Rao noticed the pattern of unlawful discrimination occurring against the African-American employees.

25.    Mr. Rao was advised by his former Captain, Albert Lynch, to distance himself from Kelly Newman and not to work with him anymore because he is African-American.

26.    Rao protested Captain Lynch's advice, and explained to Captain Lynch that he did not mind working with Mr. Newman.

27.    Rao chose to work with Kelly Newman.

28.    In addition, Kelly Newman subsequently decided to file a Charge of Discrimination with the EEOC.

29.    Mr. Rao assisted Newman with his Charge and provided him with information regarding the procedures for filing a Charge, as well as evidence to support his Charge.

30.     Once TPWD learned that Rao had assisted Newman with filing his Charge with the EEOC, TPWD retaliated against Rao for assisting him.

31.     For example, Major William Skeen, then a Lieutenant, had a friend file a fraudulent complaint about Rao, in an effort to make it look as though Rao was violating department policy.

32.     Mr. Rao contacted TPWD's Human Resources department, to complain about the unlawful retaliation to which he was being subjected.

33.     However, Human Resources refused to assist Rao with his complaint.

34.     Instead of addressing Rao's complaint, Human Resources told Rao that the Parks and Wildlife Department is "paramilitary" and as such, the retaliation laws do not apply to the Department.

35.     Therefore, on April 23, 2007, John Rao filed a Charge of Discrimination with the Equal Employment Opportunity Commission against the TPWD, under Charge No. 460-2007-03466.

36.     In his Charge, Rao asserted, among other things, that he was being subjected to retaliation for assisting and providing evidence to Newman to support Newman's Charge of Discrimination.

37.     Since the time Rao filed his Charge of Discrimination in 2007, Rao has been subjected to additional retaliation because of his Charge.

38.     For example, since the time Rao filed his Charge of Discrimination in 2007, he has repeatedly been denied promotions for which he is eminently qualified, and for which he was clearly the best qualified applicant.

39. With respect to promotions, the TPWD claims that it bases promotion decisions on each applicant's experience.

40. The reason given by the TPWD for denying Mr. Rao each promotion is false.

41. Mr. Rao has almost twenty-four years of experience as a game warden.

42. In addition to his years of experience, Rao has a Bachelor's Degree in Criminal Justice, a Master's Degree in Criminology, and has completed his Master's Degree in Behavioral Science with a sub plan in Public Service Leadership.

43. These degrees are in addition to Rao's experience and knowledge as it relates to exotic aquatic animal species and non-indigenous species.

44. Rao is considered an expert in the field of exotic species.

45. Rao is considered an expert in native species.

46. Rao is considered an expert in non-indigenous species.

47. Rao is considered an expert in commercial fishing laws.

48. Rao's expertise in fish identification is utilized throughout the State of Texas.

49. Indeed, Assistant Chief Robert Goodrich, Fisheries Enforcement of the TPWD's Law Enforcement Division, often referred to Rao as an expert in the areas of commercial fish dealers, commercial fishing laws, as well as harmful and potentially harmful exotic fish, shellfish and aquatic plants to other members of TPWD management.

50. Rao was so valuable to TPWD investigations that Assistant Chief Goodrich obtained approval to contact Rao directly with questions regarding Rao's areas of

expertise, bypassing the rigid chain of command structure in the Law Enforcement Division.

51.     Assistant Chief Goodrich utilized Rao's expertise nearly every week with investigations or answer questions within Rao's areas of expertise.

52.     Assistant Chief Goodrich sent Rao out of the district on investigations.

53.     Assistant Chief Goodrich sent Rao out of the region on investigations.

54.     Therefore, there can be no doubt that he is extremely well qualified for the positions for which he has applied.

55.     Moreover, compared to the candidates selected for promotion over him, Mr. Rao has been clearly better qualified than each of the winning job candidates.

56.     First, on March 22, 2010, Rao was denied a promotion to the position of Lieutenant.

57.     Assistant Chief Goodrich was the supervisor over the Lieutenant's position for which Rao had applied.

58.     Less than prior to the interview for the Lieutenant's position, Assistant Chief Goodrich contacted Rao regarding an unlawful seizure of a prohibited fish species, Channa Argus, commonly referred to as "Snakeheads," that the Law Enforcement Division was about to conduct.

59.     Upon hearing the details of the unlawful seizure, Rao immediately recognized that under the law the seizure by the TPWD would actually be an unlawful seizure, and could subject the TPWD to liability, and advised Assistant Chief Goodrich of his opinion.

60.    Based upon Rao's advice, Assistant Chief Goodrich stopped the unlawful seizure.

61.    Assistant Chief Goodrich thanked Rao for recognizing the problem and stopping the illegal seizure.

62.    The person who received the promotion does not have near Rao's education, his experience or his expertise in the fields of exotic, native species, non-indigenous species, as well as commercial fishing laws.

63.    In fact, the successful candidate for the Lieutenant position had only five years of experience.

64.    After Rao was denied the Lieutenant position, the TPWD directed Rao to train the successful candidate who had been promoted over him.

65.    Mr. Rao was not even considered for the position of Lieutenant for which he interviewed.

66.    Albert Lynch, who was Rao's former supervisor and on the interview panel, was aware that Mr. Rao had filed a previous Charge of Discrimination with the EEOC.

67.    Moreover, Mr. Lynch was aware that he and his supervisor, William Skeen, had been implicated in that previous Charge.

68.    In addition, two other panel members, Assistant Chief Goodrich and Joe Goff, a coworker, were also aware of Mr. Rao's previous Charge of Discrimination.

69. In fact, approximately one week before he interviewed for the Lieutenant position, Assistant Chief Goodrich had informed Mr. Rao that Colonel Pete Flores had commented about Rao's prior Charge.

70. After Rao was denied the Lieutenant position in March 2010, he asked Assistant Chief Goodrich what he could do to improve his panel interviews.

71. In response, Assistant Chief Goodrich did not give Rao any performance based reason for the failure to be promoted.

72. Rather, Assistant Chief Goodrich confirmed for Rao that the reason he did not receive the position for Lieutenant is because he had previously filed a Charge of Discrimination with the EEOC.

73. Specifically, while talking on speakerphone to Rao, who was in the presence of Kelly Newman, Assistant Chief Goodrich explained to Rao, "You didn't do anything wrong, but you filed that Complaint."

74. Moreover, Kelly Newman was riding in the car with Mr. Rao and heard Assistant Chief Goodrich tell Rao that he had not done anything wrong in the interview and that Rao was denied the promotion because he had "filed that Complaint."

75. On June 22, 2010, Mr. Rao was denied a promotion to the position of Sergeant.

76. Mr. Rao's specialized expertise clearly made him the best-qualified applicant for the Sergeant position.

77.    Yet, once again, Rao's quality and quantity of experience was ignored in favor of a game warden with far less experience than Rao.

78.    After Rao was denied the Sergeant position, he realized that the TPWD was not going to promote him regardless of his qualifications.

79.    Therefore, on September 16, 2010, Mr. Rao filed a Charge of Discrimination alleging retaliation against TPWD (Charge No. 460-2010-04155).

80.    On August 19, 2011, while Rao's Charge of Discrimination was still pending at the EEOC, Captain Nick Harmon, who acted as Interim Captain for the Harris County District after Albert Lynch resigned, held a district meeting.

81.    During this meeting, Captain Harmon boldly stated that the other districts call the Game Wardens in Rao's district "malcontents" and "complainers."

82.    Mr. Harmon also said that going forward, anyone who complains, "Austin will have paperwork ready for your release."

83.    Within Rao's district, Rao is considered to be a "malcontent" and a "complainer" because he filed a Charge of Discrimination at the EEOC.

84.    On September 1, 2011, Rao applied for the Captain Position in Harris County, which was formerly held by Albert Lynch.

85.    At the time he applied for the position, Rao had far more experience than any of the other applicants, having had almost twenty-two years experience and having worked in Harris County for his entire career.

86.    Additionally, none of the other candidates had ever been stationed in Harris County.

87.     As a result, none of the other candidates had the knowledge that Rao had concerning the specific needs of Harris County.

88.     Rao interviewed for the Captain position along with nine other candidates.

89.     Notably, Major Skeen, who had been the subject of Rao's 2007 Charge of Discrimination, was a panelist on the interview panel for the Captain Position, since TPWD again failed to put any protections in place to ensure that Mr. Rao would be given legitimate consideration for the promotion.

90.     Mr. Rao was denied the promotion to Captain.

91.     Instead, Fred Ruiz was selected for the promotion.

92.     John Rao was clearly better qualified for the Captain position than Fred Ruiz.

93.     For example, at the time Ruiz was selected for the Captain position, he had approximately five years of experience as a game warden for the TPWD.

94.     In stark contrast, Rao had twenty-two years of experience at the time.

95.     In addition, at the time he was selected for the Captain position, Ruiz had never been stationed in Harris County.

96.     In stark contrast, at the time Ruiz was selected for the Captain position, Rao had approximately twenty-two years of experience working in Harris County.

97.     Thus, in addition to lacking (by far) the years of experience Rao had, Ruiz clearly did not have the knowledge that Rao had concerning the specific needs of Harris County.

98.   On August 16, 2012, Mr. Rao reported to Captain Joe Carter and Captain Chris Davis of Internal Affairs that he was being retaliated against for filing his EEOC complaint against the TPWD.

99.   For example, Rao has had the same schedule for several years.

100.   In the summer of 2012, there was no reason for any change in Mr. Rao's schedule.

101.   The original schedule worked well for Mr. Rao and for TPWD.

102.   However, in the summer of 2012, Captain Ruiz rearranged the schedule, giving new employees in the department the days off that Mr. Rao used to have.

103.   When Mr. Rao questioned why the schedule was changed, he was given no explanation.

104.   Mr. Rao has also been subjected to unwarranted disciplinary actions.

105.   On August 6, 2012, Mr. Rao was counseled regarding the summertime initiative put in place by Captain Ruiz.

106.   Captain Ruiz told Rao that he needed to disregard all calls except Operation Game Thief ("OGT") calls.

107.   However, this order contradicted Texas Parks & Wildlife written policy that requires all calls to be answered in a timely manner, thus placing Rao in a catch-22, such that he would be insubordinate if he does not follow Captain Ruiz' orders, but would be violating policy if he did follow the Captain's orders.

108.   Captain Ruiz has also ordered Rao to violate Texas Penal Code laws.

109.   For example, on August 25, 2012, Rao investigated a boating accident.

110. Thereafter, on August 30, 2012, Captain Ruiz counseled Rao for his handling of the case, and more particularly, how Rao prepared the Offense Report.

111. Captain Ruiz reprimanded Rao for including facts concerning the suspect's emotional state following the accident.

112. Captain Ruiz further indicated that Rao should have taken the suspect's past criminal history into account.

113. Captain Ruiz also told Mr. Rao that he needed to make sure that the elements of the crime are in the offense report so that they could "stick it" to the suspect.

114. Captain Ruiz informed Mr. Rao that he needed to resubmit the Offense Report in such a way that the facts were manipulated to increase the chances that an arrest would be made, rather than presenting the facts in an unbiased objective manner for the DA to review.

115. In other words, it appeared that Captain Ruiz was attempting to put Rao in the position of writing his Offense Report in such a manner that the Harris County District Attorney would have no choice but to accept the charges.

116. However, this would have been an abuse of authority under the Texas Penal Code.

117. In addition, Ruiz' directive placed Rao in the position of misleading the DA's office by leaving out relevant facts showing the suspect's mental state at the time of the accident.

118.   Mr. Rao has also been subjected to premeditated actions that have put his safety at risk.

119.   On September 1, 2012 Mr. Rao was assigned to report to Waller County at 6:00 a.m.

120.   Mr. Rao joined Captain Ruiz and four other game wardens to cover the opening of dove hunting season.

121.   With the exception of John Rao, all of the game wardens were issued All-Terrain Vehicles ("ATVs") to use.

122.   Mr. Rao was instructed to patrol the fields on foot, even though everyone else was allowed to patrol the fields on the ATVs.

123.   When Mr. Rao asked Captain Ruiz if he could double up on an ATV with another warden, Ruiz' response was to say, "No.  You're going to walk."

124.   Rao walked the fields from 7:00 a.m. until 12:30 p.m.

125.   At approximately 10:00 a.m. Captain Ruiz contacted Rao and told him that he was to remain on foot in the area while the other wardens headed to a different area on their ATVs.

126.   On this day, the heat index was 108 degrees and Captain Ruiz left Mr. Rao alone, on foot, even though Captain Ruiz and the rest of the wardens had transportation and also had back up.

127.   Eventually, Rao contacted a fellow game warden during the assignment because Rao was not feeling well due to the excessive heat.

128.　In that conversation, his coworker informed Rao that Captain Ruiz was trying to get Rao to "fail" and to get Rao to "fall out."

129.　Captain Ruiz disregarded Rao's safety by making Rao walk the fields while supplying the other game wardens with ATVs, so that they did not have to patrol the fields on foot in the sweltering heat.

130.　Several hunters even asked Rao throughout the course of the day why he did not have an ATV.

131.　Rao later learned from game wardens at the Galveston Law Enforcement Office that Captain Ruiz had been bragging about his retaliation against Rao by telling the game wardens in that office how he made Rao walk the dove fields.

132.　On November 30, 2012, Rao took the TPWD Game Warden Physical Readiness Coordinator ("PRT") test.

133.　Rao successfully completed the sit up portion of the test.

134.　However, after Rao successfully completed the sit up portion of the test, Captain Ruiz claimed that Rao needed to retake the sit up portion of the exam.

135.　Captain Ruiz is not even trained to administer the PRT test.

136.　Captain Ruiz is not a PRT coordinator.

137.　Nevertheless, Captain Ruiz demanded that the trained coordinators who administered the test, and who had approved Rao's sit up test, needed to change Rao's score.

138.　Captain Ruiz failed to follow TPWD protocols when he made this demand.

139.   Despite Ruiz' failure to follow protocol, TPWD nonetheless "investigated" whether Rao would have to retake a portion of the PRT examination.

140.   TPWD eventually determined that Rao would, in fact, have to retake the sit up portion of the examination.

141.   TPWD did not follow its own policies and procedures when making this determination.

142.   While TPWD was determining whether Rao was going to have to retake the sit up portion of the PRT, Captain Ruiz continued his harassing and discriminating behavior toward Rao.

143.   On January 17, 2013, Rao met with Major Skeen and Captain Ruiz.

144.   During this meeting, Mr. Rao was called a "cancer" in the Department and a "troublemaker."

145.   Rao was repeatedly threatened with losing his job and was informed that his next evaluation would not be a good one.

146.   During this meeting, Mr. Rao was also told if he does not like his job, he should leave and go find a job with the Houston Zoo or HPD.

147.   Next, Major Skeen and Captain Ruiz threatened Rao.

148.   Rao was told that if they hear that Rao "talks bad about the department to anyone," he would lose his job.

149.   Rao does not talk bad about TPWD.

150.   During this meeting, Rao was also told that his ticket numbers do not reflect the amount of hours he worked.

151. That allegation was completely false.

152. In fact, Rao led the district the previous year in ticket numbers.

153. Rao was also told he had several complaints against him from the opening day of dove season back on September 1, 2012.

154. These allegations are also untrue.

155. Rao also learned from members of the public that since the opening day of dove season, Captain Ruiz has been trying on multiple occasions to solicit negative feedback on Rao.

156. Captain Ruiz and Major Skeen also accused Rao of failing to follow the proper chain-of-command.

157. In fact, during the January 17, 2013 meeting, Rao was told that he could not go to anyone else besides Fred Ruiz with any questions or concerns he might have during the course and scope of his work for TWPD.

158. For example, on January 17, 2013, Rao attended EJustice training in the morning.

159. During the training, Assistant Commander Gary Teeler indicated that if the game wardens had any problems with EJustice, that the wardens could call him or Cody Jones directly.

160. However, Captain Ruiz told John Rao that he was not allowed to call Assistant Commander Teeler.

161. Ruiz claimed that it would be a "chain of command" violation for Rao to contact Assistant Commander Teeler regarding any problems with EJustice.

162.   During the January 17 meeting, Captain Ruiz and Major Skeen reprimanded Rao for using "non-state issued" M4 magazines.

163.   However, Rao had been given the M4 magazines to use by his supervisor.

164.   Therefore, Rao should not have been reprimanded for using the M4 magazines.

165.   On February 8, 2013, Captain Ruiz demanded that Mr. Rao document his whereabouts for a portion of the workday.

166.   Specifically, Captain Ruiz demanded that Mr. Rao explain where he was between the times of 4:17 p.m. and 5:52 p.m.

167.   Mr. Rao indicated that he was stuck in traffic at the intersection of Beltway 8 and 1-45 South on the way to his residence between the hours of 4:17 p.m. and 5:52 p.m.

168.   Mr. Rao further indicated that he was heading to his residence after answering a call at Highway 290 and Huffmeister in far Northwest Harris County.

169.   Mr. Rao indicated that when he exited from Beltway 8 onto I-45 the traffic was stopped.

170.   Mr. Rao indicated that there is a large construction project being undertaken on this section of I-45.

171.   Finally, Mr. Rao documented that there was also an accident that was impeding an already bad traffic situation during that time.

172.   Certainly, TPWD is familiar with Houston's traffic congestion problems.

173.    Moreover, no other TPWD wardens in his district have been disciplined for being "stuck in traffic" since this routinely occurs in the greater Houston metropolitan area.

174.    Nonetheless, Captain Ruiz singled out Rao and required him to document his time in memorandum format as a condition of his continuing employment with TPWD.

175.    On February 18, 2013, Rao prepared the memorandum and his response and filed the memorandum and response pursuant to TPWD policy.

176.    On February 8, 2013, Mr. Rao transported another TPWD employee, to the Dickinson Marine Lab, a TPWD facility, to retrieve that employee's state truck, which was a TPWD vehicle.

177.    Rao also picked up some TPWD literature at the Dickinson Marine Lab for distribution to the public during this trip.

178.    Rao understood that any Texas Parks and Wildlife Department employee could ride in state vehicles.

179.    Moreover, on many occasions Rao has observed Administrative Assistants riding as passengers in state vehicles for the purposes of "going to lunch."

180.    Additionally, Rao has been asked to help shuttle vehicles on numerous occasions for other non Law Enforcement personnel.

181.    Nonetheless, on February 18, 2013, Captain Ruiz demanded that Rao document his actions relating to driving the TPWD employee in a company vehicle

to the Dickinson Marine Lab as a condition of his continuing employment with TPWD.

182. In other words, Ruiz continued to harass Rao by reprimanding him for a "violation of company policy" that Captain Ruiz when the conduct cited by Ruiz was not a policy violation at all.

183. Rather, Ruiz falsely claimed that Rao's conducted violated policy in order to harass Rao.

184. Rao was performing official duties by assisting another employee and in picking up literature to distribute to the public.

185. Rao promptly prepared the required memorandum, and disputed the write up pursuant to TPWD policy.

186. On February 25, 2013, Captain Ruiz informed Mr. Rao that TPWD had finally formally determined that Mr. Rao would be forced to retake the sit up portion of the PRT on March 23, 2013.

187. Rao then filed a memorandum with Human Resources, once again in accordance with TPWD policy, noting his opposition to the decision to retake the PRT examination.

188. At the end of February 2013, Rao received a telephone call from a member of TPWD's human resources staff, Errol Hardin.

189. Errol Hardin told Rao that TPWD would "back" Captain Ruiz and the other members of TPWD management who were retaliating against Rao.

190.   Mr. Hardin also indicated that Mr. Rao needed to determine whether he wants to continue working for TPWD, because the "treatment" to which Rao was subjected was not going to change.

191.   The vast majority of TPWD employees are aware of the retaliatory treatment Rao has been forced to endure since he first opposed the discriminatory treatment toward African-Americans years ago.

192.   The vast majority of TPWD employees are also aware of the charges Rao has brought in order to assert his own rights to be free of retaliatory treatment for opposing TPWD's unlawful treatment.

## VI.
## CAUSE OF ACTION—RETALIATION

193.   Each and every allegation contained in the foregoing paragraphs are realleged as if fully rewritten herein.

194.   As described above, as a result of Rao's opposition to the unlawful race discrimination and retaliation committed by the TPWD, including asserting his own rights to be free from retaliation, as well as the rights of the African-American game wardens, he has been retaliated against by TPWD in violation of Title VII of the 1964 Civil Rights Act, as amended 42 U.S.C. § 2000e *et seq.*, and the Texas Labor Code.

195.   Defendant failed to promote Plaintiff, and has continuously harassed Plaintiff, and subjected him to different terms, conditions, and privileges of employment because he opposed unlawful employment discrimination in the

workplace, in violation of Title VII of the 1964 Civil Rights Act, as amended 42 U.S.C. § 2000e *et seq*., and the Texas Labor Code.

196. As a result of Defendant's unlawful retaliation, Plaintiff has incurred damages.

## VII.
## ATTORNEY'S FEES

197. Each and every allegation contained in the foregoing paragraphs are re-alleged as if fully rewritten herein.

198. Plaintiff is entitled to recover attorney's fees and costs for bringing this action pursuant to 42 U.S.C. § 1988.

## VIII.
## JURY DEMAND

199. Plaintiff requests a trial by jury on all issues triable by a jury in this case.

## IX.
## RELIEF REQUESTED

200. Plaintiff requests the following relief:

    a.    For actual damages for the period of time provided by law including appropriate backpay and reimbursement for lost pension, insurance, and all other benefits;

    b.    For compensatory damages as allowed by law;

    c.    For pre-judgment and post-judgment interest as allowed by law;

    d.    For attorney's fees and costs of court; and

    e.    For such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

CLINE | AHMAD


By: /s/ Nasim Ahmad
Nasim Ahmad
State Bar No. 24014186
Delana Cline
State Bar No. 24009960
21 Waterway, Suite 300
The Woodlands, Texas 77380
Telephone: (281) 362-2801
Telecopier: (281) 864-4379

Of Counsel:

Joseph Y. Ahmad
Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing, P.C.
State Bar No. 00941100
3460 Houston Center
1221 McKinney Street
Houston, Texas 77010
Telephone: (713) 655-1101
Telecopier: (713) 655-0062

ATTORNEYS FOR PLAINTIFF
JOHN B. RAO, JR.